May it please the court, my name is Michael Martin, and I am counsel for Hsiao Oog Shin. And I want to say thank you to everybody and to the dean of the law school for having us all here. This is a real privilege. We don't get to do this very often and much less have an audience other than a handful of lawyers sitting behind us. With that, the facts of the case are fairly straightforward as far as I'm concerned. Captain Shin was the master of a 590-foot ship that was entering the Strait of Juan de Fuca, approaching Port Angeles when a Coast Guard boarding party boarded the ship. During that boarding of the ship, Coast Guard officers became concerned that there had been drinking on the ship and actually had concerns that Captain Shin had been drinking. As a result of this investigation, a Coast Guard officer administered portable breath tests on Captain Shin. Prior to administering the tests, the Coast Guard did not check Captain Shin's mouth for the presence of any foreign objects, did not allow for a 15-minute deprivation period, and did not allow for the same 15 minutes for an observation period. Counsel, can I just jump, though, straight to Brannan? Because I honestly don't know how you can square your argument on the admissibility of those results with Brannan. So maybe you can just address that. I will go directly to Brannan, then, Your Honor. At both the Dalbert hearing and then during the trial for jury instructions, all the parties relied upon Brannan. The court and the government relied a lot upon Brannan at the Dalbert hearing. And as a result, the trial court found that Brannan controlled, ran all this along, and as a result of that found that the breath tests should be admissible. I argued the opposite because Brannan said the best possible way for administering breath tests is with a 15-minute observation period and the other protocols, as stated in Brannan. When we get to the point of jury instructions, I requested an instruction based upon Brannan. Now, I don't see how the government can have it both ways. If Brannan is a correct statement of the law, then I think I'm entitled to have the jury instruction about Brannan. If Brannan is not a correct statement of the law, then we're bound by Brannan. We're going to follow it here. So this case, I think, is a step beyond Brannan because Brannan, the facts in Brannan, included the fact that there were protocols that were applied, administered during the breath test in that case. The breath test was partially completed, but it was found to be admissible at the same time. Here, we have no protocols at all. None. Zero. Even though the Coast Guard has protocols that it uses in employment situations where someone has the prospect of losing a job because of the results of the breath test, yet when someone is facing loss of liberty, the Coast Guard has no protocols  They just administer the test and that's the end of it. But doesn't Brannan have an answer to that? It says that you can argue that to the jury. Well, certainly, it can be argued to a jury, but I think I was It was no good. You know, this test, it came up with that number, but look, it's what they did wrong. I think Why isn't that the answer? Because I think You're not using the Brannan answer. We are bound by it. I think we're one step beyond Brannan because this case does not include any protocols at all. It seems to me that Brannan is different. In Brannan, there wasn't a concern about the waiting period. And it's the waiting period that makes sure that this box, this intoximeter, is not measuring mouth alcohol as well as the breath alcohol. So it's not just that it was an improperly administered test. It was improperly administered in a very different way in Brannan, it seems to me. Correct me if I'm wrong, but my understanding of the facts there is that the defendant blew into the machine. He wouldn't try him very hard. And so it registered a certain number above the legal limit. But then it rejected the test because it wasn't a sufficient breath sample. And the court in Brannan analogized that to a thermometer, right, which would be very linear. And so if we take the thermometer out of a patient's mouth too soon, we know that the patient may have had at least a 100-degree temperature, could in fact have had 103-degree temperature. But there wasn't a risk, in that case, of the reading being too high. It might be too low. In the situation we have here, it seems to me, without the waiting period, I'm concerned about this intoximeter's ability to separate breath alcohol from mouth alcohol. In other words, there's a risk that the reading could have been too high. And I want to know where in the record, what did the trial court hear in this extensive Dalbert hearing about that? Every expert witness, both for the government and for the defense, testified because of the lack of a mouth alcohol detector in this device, it was critical that there be protocols that are adhered to for the administration of the test. They all agreed. They all agreed to the 15 minutes. Actually, they said 15 to 20 minutes, depending on who you talked to. Mr. Volpe for the government, Dr. Hilstala for the defense, Mary McMurray for the defense. Even the representative of the manufacturer for the device, Mr. Forrester, agreed that the protocols were critical. Well, I don't know about the other protocols. I'm talking about, to be clear, I'm concerned about the protocol about the waiting period at the outset, not the time period between the tests, but the waiting period at the outset. Yes. There's trial testimony about that, is there not? The trial testimony about the ---- Well, forgive me, Dalbert testimony at the evidentiary hearing. I'm sorry, what? I misspoke. I meant to ask you about the evidentiary hearing, the Dalbert hearing. Right, right. So the testimony at both the hearing and at the trial were very much the same about the waiting period. What happened is that there was no direct observation, and the government admits this in its brief, that there was approximately 8 to 10 minutes combined of various officers who say they saw Captain Shin before the test was administered. The problem is that the testimony also is that one of the officers, MSTC Shannon Ellis, testified that she was sending the captain off to pick up records and bring them back three or four times, and there was no observation of the captain during this time period at all, because he was going to a different deck. But isn't the reason that matters, because we have to know that there's this observation period before you administer the test so the mouth alcohol can dissipate, and we know that it's dissipated? I believe that's correct. Was there testimony that a different kind of intoximeter might have been able to separate mouth alcohol from breath alcohol? I'm trying to remember the testimony of the experts. I believe there was some testimony that other devices that do have mouth alcohol detectors would be sufficient, but because this device didn't, that made the protocols that much more important. I am going to let my colleagues ask a question. I promised to give them a word of advice, but I just have one more, and that is if I'm understanding Brannon correctly, then I guess I'm not understanding why I think it was a defense counsel's position at trial that Brannon controls. Well, I argue Brannon controls because Brannon included the language saying that the best method for breath tests included the 50-minute waiting period, and then the other protocols that are stated in the draft instruction that I had proposed to the Court. Let me get this straight. There were three tests, right? There were three tests, correct. And is the theory that between tests maybe your client went out and gargled with whiskey? No, no. So just to fool the – I mean, by the end of the third test, certainly 50 minutes had passed. No. I don't believe that's correct, Your Honor. So the theory is not that there was something that happened during the test or between the tests, because all the tests took place within about two to three minutes of each other. If you look at the field sorority test form. So he's seeing the Coast Guard pull up and says, you know, I think I'll go ahead and gargle with some whiskey. Would be an interesting fact, but we don't have that. But isn't a tougher fact for you that the first test was void, the second test was reading above the limit, and the third test was higher? Well, I don't think it is necessarily a dispositive fact because of the fact that takes place after the tests are completed when the Coast Guard officer calls headquarters and talks about my client chewing gum like a madman, and then everyone admits no one checked his mouth. They all say no one checked his mouth. Well, but Counselor, as I understand that the significance of the higher reading for that last test is that if mouth alcohol was what was driving the reading, the positive reading that he got, it would have dissipated between the second and third tests instead of being higher. So wasn't there expert testimony that addressed that? There was testimony from at least Mr. Forrester, the manufacturer representative, that that would be the case. But also there was expert testimony. And that's why I asked. You know, there's a theory that somehow he snuck in some alcohol. He said, well, I'm being given this breathalyzer test. I think I'll go take a few swigs of alcohol and, you know, gargle with it just to fool the. None of that really makes any difference in my view, Your Honor, because. How do you explain the reading going up? I don't know how to explain it because he, from everything that we know, had chewing gum in his mouth at the time, which simply invalidates the test. No, we don't know that. We know he had chewing gum in his mouth after the test. But there's no explanation as to how it got there. It is just as reasonable that. He put it there? That's how you chew gum usually gets it. That isn't the point, then, that there wasn't an observation period. The Coast Guard folks testified that nobody saw him put anything in his mouth. They all testified they didn't give him anything and they didn't see him put anything in his mouth. When you said invalidated, you're referring to the what set of regs? When you said the chewing gum invalidated the test. All of the experts, I believe, testified that because of the standards in the scientific community for the administration of breath tests, if someone has a foreign object in his or her mouth during the test, the tests are invalid, you need to start over. That's the end of the question. Was there any expert testimony that suggested chewing gum could lead to a mouth alcohol reading? The expert testimony was simply limited to the fact if the gum is in the mouth, it invalidates tests, period. Okay. Well, let me ask you this, because you ñ there was some confusion, I thought, in the briefs as to whether ñ what the standard of review was here. You sort of suggested that this was a motion to suppress, whereas I thought of it more as just a typical evidentiary, a request to exclude evidence that you thought was unreliable that we would review for an abuse of discretion. And given the expert testimony the magistrate judge had before him ñ was it a ñ was it him or her? I can't remember. How is this an abuse of discretion? I understand that you think the call was close, but this strikes me as something that could have ñ the judge could have reasonably made the call to let it in. Possibly, although if the Court recalls the opinion in Brannon, the Court in that case said this is a close case. Well, I ñ I view the case that we have in front of us now even closer than Brannon was because of the lack of any protocols at all. With that, Your Honor, unless there are more questions, I have three minutes left. I just assume reserve if there is any, Your Honor. Thank you.   Thank you from the government. Your Honors, may it please the Court, Matthew Thomas on behalf of the United States of America. The question for the Court today is whether or not to affirm the defendant's conviction in district court for operating a vessel with a blood alcohol rate of .04 or greater. I'd like to address some of the questions that came up during my ñ during counsel's presentation. The first was about the waiting period. Your Honor, what I wanted to mention about that waiting period, although the Coast Guard did not strictly follow a protocol as to a waiting period, they pretty much accomplished it. Officer Muniz testified that he was on the bridge with the defendant at about 435. He gave the test where they actually got a breast sample at 454. So that's about 19 minutes. Now, granted, during part of that time, the defendant would go and get a logbook. Officer Shannon Ellis was there. It was her job to check the logbooks. She would send him, but she said she had him, in her view, for about 10 to 15 minutes. And Officer Muniz said that when he was on the bridge, he was within his view and he observed him. There was one other officer there who also said he observed him. That was Officer Jones, who assisted with the test. There was another question about dissipation. Let me ask you this, though. How do you respond to the defense argument that these results, given the lapses in protocol, wouldn't have even been reliable enough to decide whether someone should keep their job? This person ended up having to serve prison time for this. How can something that's not even reliable enough to warrant a job action be reliable enough to send someone to prison? The reference in the briefing to testing by regulation in an office setting of employees, our position is those protocols do not apply to the Coast Guard, but I think we should talk about reliability. And we had testimony about reliability in this case during the Daubert hearing and at trial. Your Honor is asked about what if he swigged alcohol. Well, it's very natural. You know, you're up there. You're going to be tested for alcohol. You want to steal your nerve by taking a drink while you're up there. Is there any testimony? Is there any testimony he knew he was going to be tested for alcohol before he went below deck? Any testimony at all? No. It's sort of like when you get stopped on the road some night and a cop hasn't walked the line yet. You go back in and take a quick drink just to get rid of the jitters, right? Everybody does that. They were doing routine boarding, as I understand it, to check the vessel's logs, right? And for contraband and for stowaways, right? Yes. And for drunkenness and for equipment malfunctions and for unsafe conditions, right? Yes. That's what policemen do. It was not to arrest the captain for being under the influence of alcohol. Your Honor, though, let's take for the purpose of argument your example. Let's say he swigged alcohol. The CEO of Intoximeters testified about this. He said if he swigged alcohol and took the breath test, his reading would be off the charts. The ALCO sensor for tests up to .40, and he said it would be at least at .40. Now, what's important here is that they gave a second test, and you had asked about whether this machine tests for mouth alcohol. The answer is no, it doesn't. That's why that second test is so important. And that second test was even higher, but there was a very close correlation. It was .102 and .108. And Rankin Forrester, the CEO, and also Edward Conde, who works in the Volpe Center for Department of Transportation, and whose job it is to certify these machines, they both testified that those results are inconsistent with mouth alcohol. Could I just ask, inconsistent, as I understood their testimony, because it went up between the second and third test. That's what's so inconsistent, right? Yes. Yeah. Thank you. Now, what about chewing gum like a madman? That call, there was a reference to the gum chewing. That was at .506. The tests where they got the readings were around .454 and .455. At .506, the tests had been done. Officer Jones testified he even gave the defendant a drink of water. He could have ate and drank whatever he wished at that point in time. He could have had a glass of wine. He probably wouldn't want to, but at that point in time, it didn't matter. It was 5 in the morning. Who doesn't? Your Honor, it seemed that your questions mainly pertain to Brannan. I think it's a good case for giving guidance. And unless the Court has further questions. Well, I have two further questions.  As counsel said, why should you have it both ways? If Brannan is indeed controlling, if counsel just asked for an instruction that more or less paraphrased what Brannan said, why wasn't that there not to give the instruction? Judge Criatura, Magistrate Judge Criatura, found that it was a comment on the evidence. The issue was reliability. That's what we argued about at trial. Were these results reliable? And the Court said any further comment of this Court would unnecessarily sway the jury one way or the other. But how could the ‑‑ I don't understand that. We have this controlling case that you agree sets the legal standard. All defense counsel was asking that the jury be advised of what our circuit had held, in terms of judging the reliability of the very evidence that was before them. How is that a comment on the evidence? The instruction came right out of dicta in Brannan. And it was quoting an expert named Dubowski in this breath test area. It was not a jury instruction in Brannan. And one of the ‑‑ Judge Layton, who reviewed this matter on appeal from the Magistrate Court, he listed that instruction in his finding. And one of them was ‑‑ one of the lines in it was, omission of these safeguards lowers the reliability of the tests. That's just not true. That was our position. And I think Judge Criatura, his view was, if I give this instruction, I'm basically taking sides in this factual dispute about whether or not these tests are reliable. I gather your position that this really was not an instruction at all. Instructions, after all, tell the jury how to review the evidence or how to apply the law to the evidence. Yes, the court found, the trial judge found that it would have been a comment on the evidence. Okay. Thank you. Thank you. You've got three minutes. Thank you. With respect to the jury instruction, the requested jury instruction that wasn't given, I have to respectfully disagree that it was a commenting on the evidence. There are so many instructions that are given that would seem to fall into that same commenting on the evidence, elements of the offense instructions, intent instructions, things like that, that I don't see how this instruction is any worse or any more so commenting on the evidence. It doesn't instruct the jury anything. It comments on the reliability of the evidence. It's quite clear. I mean, that's what you want an instruction to do. It doesn't tell the jury, if you find this or this. What was the exact text of the instruction? Do you have it? What was the exact instruction? Yeah, the proposed instruction. It reads as follows. The best way of administering a breath test is to have a period of observation of the subject 15 minutes before the test, to have blank tests preceding each of two actual tests, and to run a control test following the actual tests. Omission of these safeguards lowers the reliability of the test, but it does not eliminate them as scientific aids to a fact finder investigating intoxication. I've seen a lot of instructions. I've never seen one that starts out best way. I mean, that's something that you can present as evidence, but I've never seen one like it. Have you? Have you ever gotten an instruction like that? Well, I've never had this situation before. The answer is no. The answer is no, right? The answer is no. Have you ever seen one in the case? I have not. It doesn't mean that it wasn't a proper theory of defense case. Well, but frankly, is this a proper kind of instruction? I think what the government is saying and what a district judge and a magistrate judge said is this is not a proper instruction. It doesn't instruct the jury in anything. It tells them what is the weight of the evidence, what weight should be accorded to certain kinds of evidence. Why aren't they absolutely right about that? Pardon me, Your Honor? Why aren't they absolutely right about that? I still believe that I was entitled to a theory of defense instruction based upon Brannon, which both the government and the trial court based decisions on in the Delbert hearing and a trial. I think I was entitled to it. Okay. Thank you. Okay. Case is argued with 10 minutes.
judges: Kozinski, Christen, Watford, Cjj